In the Matter of MORDECAI P. SPRINGER, an Attorney, Respondent.

First Department, January 10, 1930.

*Isidor J. Kresel* of counsel [*Harold I. T. Schnurer* and *Abraham Freedman* with him on the brief], for the petitioners.

*Mordecai P. Springer*, in person.

DOWLING, P. J.    The respondent was admitted to practice as an attorney and counselor at law in the State of New York in October, 1913, at a term of the Appellate Division of the Supreme Court of the State of New York, First Department.

The petition charges that the respondent has been guilty of misconduct as a member of the bar in (a) the solicitation of retainers; (b) the employment of persons, not members of the bar, to solicit retainers for a compensation; (c) the promise of compensation to such persons for such services; (d, e, f, g, h) failure to comply with court orders fixing his fees in infants' cases and retaining larger fees; (i) failure to pay over money to a client; and (j) failure to obtain court orders authorizing the settlement of infants' cases and fixing his fees therein.

The respondent's answer put these charges in issue, and the matter was referred to a referee to take testimony in regard to the said charges and to report the same with his opinion thereon to this court.    The referee has reported finding the charges proven in part and the petitioners have moved for such action on the report as this court may deem just and proper.

The facts of solicitation, as found by the referee, are as follows: For some years Mr. Foley, a forty-dollar-a-week clerk, was in respondent's employ.    He brought in quite a number of cases. It was admitted by respondent that Mr. Foley brought in a good many claims.    Foley was not called as a witness.    It was testified by respondent that Foley now resides in Michigan and that he left respondent's employ some seven years ago.    The other solicitors named were Isidore Rosenbaum, sometimes referred to under the name of "Rose," alleged by respondent to be a lifelong friend, and Maxwell P. Springer, a cousin of respondent.    Respondent testified that he could not give any approximate idea of the number of people who secured retainers for him, because with every one of his friends he told them they should recommend him when they should hear of a case, and he always gave them a couple of blank

retainers and told them to get signatures for him. Respondent testified that he said to them, " Immediately you hear of an accident happening to your friends use your good offices," and they said, " All right;" that these people, his friends, brought retainers signed by claimants to him, and the people who signed the retainers were perfect strangers to him; that the retainers were brought to him before he saw the claimants. The record contains testimony involving solicitation by " Rose " in a number of instances. As to Maxwell P. Springer, respondent testified that he was an investigator; that he had no office, just a residence; that respondent did not know how he was listed in the telephone book, but believed it was Maxwell P. Springer. Respondent claimed that people called Maxwell Springer when they thought they were calling respondent. After people called Maxwell Springer, he (Maxwell) went out and got the case. Respondent gave his card to Maxwell Springer to give to people. Asked if he could tell how it came to be that so many people mistook his cousin for him, respondent replied, " Whenever he brought a case he said they wanted you for the attorney; and we were on very intimate terms, and I helped him out a lot, and he brought me a case once in a while. He did not do me any favor; it was my own case." Maxwell Springer brought retainers to respondent's office and sometimes mailed them to him. Respondent testified that when people were looking for him and accidentally ran across his cousin, Maxwell Springer, the latter was friendly and understood that he was to go out and get the retainer from the people. Neither Rose nor Maxwell Springer was called as a witness before the referee.

The referee found that over a course of years Rose and Maxwell Springer energetically went about to get accident cases into the respondent's hands, but there was no direct proof of their receiving a consideration for their work. Respondent's testimony indicates that he felt Rose's family received compensation for the time given by Rose to securing retainers when respondent was associated with Rose's mother in a boarding house business some years before. As to Maxwell Springer, respondent testified that he put him in the real estate business.

On charges (d), (e), (f), (g) and (h), the facts are, in substance, that after an order of the court had been secured by the respondent, fixing his fee at an amount less than the fifty per cent agreed upon in the retainer, the respondent would retain a sum equal to fifty per cent of the total amount of the settlement of the infant's case and the parent's case. The respondent testified: " With regard to the infant cases, I never violated an order of the Court, I always paid what the Court ordered to be paid. I took, however, out of

the father's settlement, a sum of money above the 50 per cent to which I was entitled by contract, both to pay by way of disbursements and also by way of making up the 50 per cent on the entire transaction.  *  *  *  The agreement was always understood at the time that the guardian, the father or mother, came down to the office and signed the papers, and whenever they objected to it, and sometimes they did, why, then I did not take any more, because I never had any quarrels with my clients.  So that this money which I took from the father's share was in accordance with the contract that I had with the father or with the mother."

In his report the referee states: " I find that paragraphs (d), (e), (f), (g) and (h) are founded wholly and solely upon the theory that money was retained from the infants.  *  *  *  These charges are that the respondent took more from the infant than the Court allowed.  This strictly speaking he did not do."

The referee concluded that respondent was not guilty of the misconduct charged in these paragraphs.  Technically, respondent is not guilty.  However, he is not free from criticism.  On his own admission, he withheld from his adult client more than he was entitled to receive, and it is possible that, had he placed all the facts before the court, the order might have been made in such a way as to avoid permitting respondent to obtain, by indirection, more than the court desired him to have.

On charge (i) the record shows that one Mary Sullivan retained respondent to prosecute a claim for her.  Action was brought in the Municipal Court, which action Mrs. Sullivan testified respondent told her was dismissed because no one was present when the case was called.  Mrs. Sullivan did not want to open the matter again and lost interest in it.  Respondent, however, commenced an action in the City Court.  This was pending for a long time, and as it neared time for trial respondent endeavored to get into communication with Mrs. Sullivan and wrote several letters to her to which she did not respond.  On the eve of the trial he sent her a telegram.  While she did not actually receive the telegram, she testified she heard about it.  Failing to reach his client, respondent agreed to settle the case, a consent judgment was entered against one of the defendants, and several days after a satisfaction of that judgment by respondent was filed.

The charge is that he concealed this judgment from his client and utilized the money secured thereby for his own private purpose.

Mrs. Sullivan testified that she was subpœnaed to attend the investigation being conducted before Mr. Justice WASSERVOGEL and then learned that respondent had received some money in her case.  Following a talk with some one at the investigation,

she called upon respondent and later received from him a check for $70 out of a settlement of $150.

It appears that respondent received a check for $150 in settlement of the case from the insurance company on January 27, 1928. This check was deposited by respondent in his account with the Bank of the United States. Payment was made to Mrs. Sullivan about ten days before May 7, 1928. A representative of the Bank of the United States testified that from the 8th of February to the 14th of February, 1928, the balance to the credit of respondent's account in that bank was $59.30. At no other time, between the receipt of the check from the insurance company and payment to Mrs. Sullivan, was the balance insufficient to pay the sum coming to Mrs. Sullivan. During this period, however, respondent had to his credit in another bank in Rockaway, which he used for business matters in which he was engaged, an amount sufficient to make up the difference between the amount due Mrs. Sullivan and the balance in the Bank of the United States.

The referee, in his report, states: " In my opinion Mr. Springer was negligent in the handling of the matter in failing to write to his client specifically stating that the case had been settled and that he had $75 for her. While I cannot find, on the whole evidence, that there was intentional wrongdoing which must be proved to show either concealment or conversion, there was neglect and failure to conduct himself according to what may be considered the proper standards of professional duty. I agree with counsel for the petitioners that a high sense of duty on the part of Mr. Springer would have caused him to send a letter or letters specifically informing his client that the case had been settled and that he had money on hand for her, and his failure to do so was negligent, and his conduct here did not measure up to high standards of professional care. I agree with counsel for the petitioners that a minimum amount of $75 should have been kept in the Bank of U. S. I agree with counsel for the petitioners that a careful and prudent lawyer would have been sure to preserve in his files any letters that were returned by the post office because the address of the client was not found, and generally to preserve proof of thorough efforts to find his client and give her her money. Nevertheless, those elements which would justify so serious a finding as that of concealment, which implies intent, and of conversion, which implies the deliberate deprivation of his client's money, are lacking."

Under (j) respondent is charged, and he admits the charge, with the settlement of infants' cases without court order. The report of the referee states: " These charges the respondent admits, but alleges in justification or extenuation that it was a widespread

custom among surety companies to settle infant cases without court order, that only those cases involving amounts of less than $100 were so settled, and that no harm was done the infant. How general such a custom was is not proved, and the fact remains that the respondent admits the acts charged."

Upon all the facts establishing a loose, careless and unlawful conduct of his cases by respondent, even though not a criminal one, I think he should be suspended for one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered herein.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent suspended for one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.