In the Matter of IRVING B. LINDEN, an Attorney, Respondent.

First Department, March 10, 1930.

*Isidor J. Kresel* of counsel [*William Dean Embree* and *Abraham Freedman* with him on the brief], for the petitioners.

*Thomas I. Sheridan* of counsel [*Edward F. Moran* with him on the brief; *Hartman, Sheridan & Tekulsky*, attorneys], for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department, on October 1, 1913, under the name of Irving Lindenbaum. On October 27, 1916, by order of the Supreme Court, Kings county, respondent was authorized to assume the name of Irving Bruce Linden on and after December 14, 1916, by which he has since been known.

The petition charges respondent with misconduct as an attorney at law in the solicitation of retainers from persons having claims for personal injuries, with specific instances of such solicitation alleged; failing to obtain court order authorizing the settlement of

an infant's claim, and failure to comply with the terms of an order fixing fee in an infant's action, and converting the sum withheld from client in excess of the amount named in the order. Respondent answered the petition and the matter was referred to a referee to take testimony and report the same to this court. The referee has duly reported, and the petitioners now move that respondent be adjudged guilty of professional misconduct as charged in the petition, and for such action in the matter as the court may deem proper.

The learned referee found in favor of respondent with reference to all of the cases set forth in the petition in which solicitation was charged. Counsel for petitioners conceded that the testimony in all of the cases did not support the charges, but contends that the proof with reference to the Limbersky, Marchese and Wohl cases supports the charges of solicitation.

In the Wohl case, Abraham Wohl testified to sustaining an injury in an accident; further: " Q. Now, did you give the case to a lawyer? A. I gave it to a lawyer, yes. Q. Tell us about that. A. Well, a man came over to me, he says he is going to get me a lawyer, and I gave him the case." Later he received a letter from respondent and went down and saw respondent. Thereafter the case was settled and he received a check at his home. Wohl testified, " the man that took the case off me gave me the check."

In the Marchese case, Vincent Marchese testified that his wife was injured in July, 1924; about a week later, a man whom neither he nor his wife knew called and asked whether they wanted to have a case for that accident. This man said he belonged to respondent's office. Marchese asked him if he worked for Mr. Linden and he said yes. Marchese signed a form which he did not read. Later he called at respondent's office. Eventually the matter was settled and Marchese received a check from respondent. Opposed to this story of Marchese is the testimony of Philip Feinman who testified that he was employed as a clerk by respondent in 1924 and worked about a year and a half; he remembered the Marchese case, and stated that Marchese had been brought to respondent's office by a Jewish man; they arrived at a time when respondent had just gone away on a trip, shortly previous to their arrival; Feinman said he would have to go to Marchese's house and get the facts from Mrs. Marchese. The next day Feinman went and saw Mrs. Marchese and had her sign a retainer, and got from her a statement of the details of the accident; Marchese loaned him a camera to take pictures of the scene of the accident. Petitioners comment on the failure of respondent's counsel to question Marchese about this side of the picture, and also point to the fact that respondent failed to produce the retainer or pictures, or the man who is alleged

to have brought Marchese to respondent's office and who is described as a peddler going from house to house, and that someone in his family had had a case sometime previous to his bringing Marchese to respondent's office.

In the Limbersky case, the testimony is that Harry Limbersky was injured falling on the stairs in the house where he lived; about two weeks later while he was in a store on Brook avenue, Maxwell Springer, an investigator who had an office with respondent, came to him and said: " I will take care of your case." Limbersky thought Springer was a lawyer and gave him the case. There was produced a letter from respondent making an appointment for a physical examination to be held at respondent's office. Later the case was settled and Limbersky received a check from Springer. Springer testified that a call came to the office and respondent told him to go. Respondent originally testified the case was recommended by one Benjamin Spiegel. After Limbersky denied he knew Spiegel, respondent testified that it was Albrecht, also known by the name of Halper.

Respondent testified that Springer is an associate of his in a real estate venture since 1922; that he also has been using him in connection with his law practice. The nature of Springer's services were described by respondent as follows: " Simply, when I had a call and the people requested specifically that I send somebody to them and these people were of a kind that only understood Yiddish or Jewish, mostly, I would ask him, as a favor, to go down and interview the people and, if necessary, sign a retainer, if I so instructed him."

This court had occasion to refer to Springer's activity in *Matter of Springer* (227 App. Div. 490). Unquestionably he was a " runner," and the record justified the conclusion that his efforts along such lines were employed for the benefit of more than one lawyer.

But we reach the conclusion that there is not sufficient proof of solicitation in the three specific cases now relied on by respondents, in view of the conflicting testimony.

In the case of Harry Jacobwitz, son of Joe Jacobwitz, the matter was settled for one hundred and twenty-five dollars. Jacobwitz testified that Springer brought him a check which Jacobwitz indorsed with his mark; Springer said the case was settled for fifty dollars and he took off five dollars for himself, and gave Jacobwitz forty-five dollars. The check produced by respondent was for sixty-two dollars and fifty cents. Jacobwitz was not cross-examined and Springer was not called to deny the testimony. However, the referee has found that respondent did pay the father sixty-two dollars and fifty cents. The charge in the Jacobwitz matter is

that respondent settled the case without obtaining a court order as required by the Judiciary Law (§ 474, as amd. by Laws of 1912, chap. 229) and rule 294 of the Rules of Civil Practice. In justification of the failure to do so there is urged the common custom of attorneys to settle infant's cases where the amount involved was small, without going through the formality of obtaining an order of compromise which would include the fixing therein of the attorney's compensation. In *Matter of Goldberg* (227 App. Div. 502) we said: " This court does not countenance any practice which ignores the provisions of the Judiciary Law and the Rules of Civil Practice." But the single instance in which respondent was at fault in this respect would not call for discipline.

In the case of Louis Silverman, son of Ida and Morris Silverman, it appears that the mother was appointed guardian *ad litem*. Suits were brought on behalf of the infant and for the parent for loss of services; settlement was agreed upon for $750, $500 in the infant's suit and $250 for the parent. The court order authorizing compromise in the infant's claim provided for a fee for respondent of $90. The retainer in the parent's action provided for a fee of fifty per cent for respondent, or $125. Out of the $750 there should have been paid to the parent and the guardian $535. Mrs. Silverman testified that she received a check in the mail from respondent for $375, and she never received any cash or other money from the respondent. Respondent testified that after the order of compromise was signed he communicated with Mrs. Silverman stating he had a check for her; in response thereto she called in person and he told her that the order permitting compromise of the infant's case had been signed and that the court had fixed the attorney's compensation at $90. He said she was surprised and stated that she and her husband had expected but $375. He explained that since the court had allowed him but $90 on the infant's case, she would receive $160 more than she expected. She answered that she would like a check for $375 and $160 in cash, adding that she could use the money in lots of ways. Respondent claims to have paid her this $160 in cash which he took from his pocket. Respondent's testimony carries the suggestion that Mrs. Silverman desired to conceal from her husband the fact that more than $375 was being received. There is a conflict between respondent's testimony and that of Mrs. Silverman as to the number of visits paid by her to respondent's office; she is positive that she was there but once and respondent offers exhibits to prove that she was there on four different dates. Respondent's attempt to justify his obligation to caution the guardian that the money to be received from the settlement of the infant's claim was to be used for the benefit of

the infant is weak. The check was for less than the amount the infant should have received ($410), and the cash which the respondent said he gave Mrs. Silverman made more than should have been put in the fund for the benefit of the infant. The desire of these parents to protect the infant is best expressed by the fact that the $375 which they say they received from respondent was deposited in a bank where it still remains. The referee felt compelled to refuse to accept respondent's statement that he paid Mrs. Silverman $160 in currency or his explanation of how he came to do so. The record justifies the referee's conclusion on this point. Respondent is unable to produce any receipt from Mrs. Silverman, or in fact any of the Silverman papers. This method of making the payment, $375 by check and $160 in cash, is in itself unusual and suspicious, in view of the necessity he was under, for his own protection, of either producing checks for the proper amounts or proper receipts, if called upon to do so. We do not believe his explanation of the transaction and give it no more credence than the learned referee did. We think it is clear that he paid the Silvermans only $375 — the fifty per cent called for by the retainer agreement — disregarding the court order, as so many other attorneys have done to their sorrow. The check was all he paid them; the $160 cash payment was an afterthought adopted to meet the difficulty in which he found himself. He still owes the infant's guardian $35, the difference between $410 which she should have received, and $375 which respondent paid her. He also owes the father $125.

For his unprofessional conduct in the Silverman cases respondent should be suspended from practice for the period of two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent suspended for two years.